John E. Lord (SBN 216111)
Email:  jlord@onellp.com
**ONE LLP**
9301 Wilshire Blvd.
Penthouse Suite
Beverly Hills, CA 90210
Telephone:   (310) 866-5157
Facsimile:   (310) 943-2085

Amanda G. Hyland (admitted *pro hac vice*)
Email:  ahyland@taylorenglish.com
Seth K. Trimble (admitted *pro hac vice*)
Email:  strimble@taylorenglish.com
**TAYLOR ENGLISH DUMA LLP**
1600 Parkwood Circle, Suite 200
Atlanta, GA  30339
Telephone:   (770) 434-6868
Facsimile:   (770) 434-7376

*Counsel for Defendant*
*Alien Visions E-Juice, Inc.*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MIKE SARIEDDINE, an individual,<br><br>Plaintiff,<br><br>v.<br><br>ALIEN VISIONS E-JUICE, INC., a California corporation; and DOES 1 through 10, inclusive,<br><br>Defendants.<br><br>AND RELATED COUNTERCLAIMS | Case No. 2:18-cv-3658-PA-MAA<br>Hon. Percy Anderson<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT ALIEN VISIONS E-JUICE, INC.'S MOTION FOR ATTORNEYS' FEES AND COSTS**<br><br>Date:          June 10, 2019<br>Time:          1:30 p.m.<br>Courtroom:   9A<br>Complaint Filed:   May 1, 2018 |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COSTS**

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................... 1

II.   FACTUAL BACKGROUND ...................................................................... 2

    A.    Sarieddine's early sales ................................................................... 2

    B.    Ever-Reversing, Contradictory First Use Dates ............................ 3

    C.    Forged Receipts ............................................................................... 4

    D.    Testimony regarding First-Use Date ............................................... 8

    E.    Discovery and Litigation Conduct .................................................. 9

    F.    Sarieddine and his counsel committed fraud on the Court. ............ 10

III.  LEGAL STANDARD AND ARGUMENT .................................................. 11

    A.    Sarieddine's claims were substantively meritless ........................... 12

    B.    Fraud on the Court Renders this Case Exceptional and Warrants
        Sanctions. ........................................................................................ 13

    C.    The conduct in this case renders it exceptional and warrants
        sanctions. ........................................................................................ 15

    D.    This Court should follow the *Brett* decision ................................. 17

IV.   THE FEES AND COSTS ARE REASONABLE. ....................................... 18

    A.    There Should Be No Apportionment for Non-Lanham Act Claims.... 18

    B.    Alien Visions' Fees are Appropriate under the Lodestar Analysis. .... 19

    C.    No Adjustment of the Lodestar Amount is Warranted. ..................... 23

V.    NON-TAXABLE COSTS SHOULD BE AWARDED. ................................ 24

VI.   CONCLUSION ......................................................................................... 25

VII.  EVIDENTIARY HEARING ..................................................................... 25

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
ATTORNEYS' FEES AND COST

**TABLE OF AUTHORITIES**

**CASES**

*AAT Bioquest, Inc. v. Tex. Fluorescence Labs., Inc.*,
  No. 14-cv-03909-DMR, 2015 U.S. Dist. LEXIS 160369 (N.D. Cal. Nov. 30, 2015) ................................................................................ 12

*AECOM Energy & Constr., Inc. v. Ripley*,
  No. 17-5398 RSWL, 2018 U.S. Dist. LEXIS 27035 (C.D. Cal. Feb. 16, 2018) ................................................................................ 23

*Banas v. Volcano Corp.*,
  47 F. Supp. 3d 957 (N.D. Cal. 2014) ................................................ 23

*Blizzard Entm't, Inc. v. Blizzard Sports Ctr., Inc.*, Case No. SACV 17-1001 JVS(DFMx) at *12 (C.D. Cal., November 2, 2018) ............... 19

*Burton Way Hotels, Ltd. v. Four Seasons Hotels Ltd.*,
  No. CV 11-303 PSG (PLAX), 2015 WL 13081297 (C.D. Cal. Jan. 21, 2015) ......................................................................................... 23

*Camacho v. Bridgeport Fin., Inc.*,
  523 F.3d 973 (9th Cir. 2008) ............................................................ 21

*Cambrian Sci. Corp. v. Cox Commc'ns, Inc.*,
  79 F. Supp. 3d 1111 (C.D. Cal. 2015) ........................................ 13, 16

*Carbajal v. Wells Fargo Bank, N.A.*,
  2015 U.S. Dist. LEXIS 192555 (C.D. Cal. July 09, 2015) ............... 22

*Cent. Mfg. v. Brett*,
  492 F.3d 876 (7th Cir. 2007) ............................................................ 17

*Chalmers v. City of L.A.*,
  796 F.2d 1205 (9th Cir. 1986) .......................................................... 21

*Chambers v. Nasco*,
  501 U.S. 32 (1991) ............................................................................ 14

*City of Burlington v. Dague*,
  505 U.S. 557 (1992) .......................................................................... 18

*Combs v. Rockwell Int'l Corp.*,
  927 F.2d 486 (9th Cir. 1991) ............................................................ 15

*Davis v. City of S.F.*,
  976 F.2d 1536 (9th Cir. 1992) .......................................................... 19

*Digital Reg of Tex., LLC v. Adobe Sys.*,
  2015 U.S. Dist. LEXIS 29328 (N.D. Cal. March 9, 2015) ............... 15

*Dzinesquare, Inc. v. Armano Luxury Alloys, Inc.*,
  2015 U.S. Dist. LEXIS 178443 (C.D. Cal. April 1, 2015) ............... 12

*Eksouzian v. Albanese*,

ii

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COST**

2015 U.S. Dist. LEXIS 189545 (C.D. Cal. Oct. 23, 2015) .............................22

*Entrepreneur Media, Inc. v. Casey et al.*,
 No. CV 18-1058 JLS (C.D. Cal. Feb. 22, 2019) ................................23

*Estate of Blas v. Winkler*,
 792 F.2d 858 (9th Cir. 1986) ..............................................16

*Fink v. Gomez*,
 239 F.3d 989 (9th Cir. 2001) ..............................................14

*Fogerty v. Fantasy, Inc.*,
 510 U.S. 517 (1994) ....................................................11

*Gates v. Deukmejian*,
 987 F.2d 1392 (9th Cir. 1992) ...........................................21

*Haeger v. Goodyear Tire & Rubber Co.*,
 793 F.3d 1122 (9th Cir. 2015) ...........................................15

*Hensley v. Eckerhart*,
 461 U.S. 424 (1983) ....................................................18

*Hicks v. Toys 'R' Us-Delaware, Inc.*,
 2014 U.S. Dist. LEXIS 135596 (C.D. Cal. Sept. 2, 2014)...............22, 23

*In re High-Tech Emple. Antitrust Litig.*,
 Case No. 11-CV-02509-LHK, 2015 U.S. Dist. LEXIS 118052
 (N.D. Cal. Sep. 2, 2015) ...............................................23

*Ingram v. Oroudjian*,
 647 F.3d 925 (9th Cir. 2011) ...........................................21

*Love v. Associated Newspapers, Ltd.*,
 611 F.3d 601 (9th Cir. 2010) ...........................................15

*Luna v. Universal City Studios, LLC*,
 2016 U.S. Dist. LEXIS 194527 (C.D. Cal. Sept. 13, 2016)...............22

*New Alaska Dev. Corp. v. Guetschow*,
 869 F.2d 1298 (9th Cir. 1989) ..........................................16

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
 134 S. Ct. 1749 (2014) .............................................1, 11, 13

*Pacific Harbor v. Carnival Air Lines, Inc.*,
 210 F.3d 1112 (9th Cir. 2000) ..........................................16

*Perfect 10, Inc. v. Giganews*,
 2015 U.S. Dist. LEXIS 54063 (C.D. Cal. Mar. 24, 2015) .................23

*Primus Auto. Fin. Servs., Inc. v. Batarse*,
 115 F.3d 644 (9th Cir. 1997) ...........................................14

*S.C. Johnson & Son, Inc. v. Nutraceutical Corp.*,
 2019 U.S. Dist. LEXIS 47937 (E.D. Wis. Mar. 22, 2019)...............18

iii

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COST**

*SECALT SA v. Wuxi Shenxi Const. Mach. Co.*,
   668 F. 3d 677 (9th Cir. 2012) ..................................................................... 12, 24

*Sunearth, Inc. v. Sun Earth Solar Power Co.*,
   839 F.3d 1179 (9th Cir. 2016) ...................................................................... 1, 11

*United Steelworkers of Am. v. Phelps Dodge Corp.*,
   896 F.2d 403 (9th Cir. 1990) ............................................................................. 21

*Universal Elecs., Inc. v. Universal Remote Control, Inc.*,
   2015 U.S. Dist. LEXIS 91403 (C.D. Cal. Mar. 10, 2015) ............................... 16

**STATUTES**

15 U.S.C. § 1117(a) ...................................................................................... 1, 11

28 U.S.C. § 1927 ......................................................................................... 17, 18

**RULES**

Fed R. Civ. P. 30(e) ........................................................................................... 15

Fed R. Civ. P. 56(h) ........................................................................................... 14

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COST**

1

## I.    INTRODUCTION

Contrary to the allegations in his complaint, Plaintiff Mike Sarieddine did not bring this lawsuit to redress an injury. He did not bring this lawsuit because he believed that Defendant Alien Visions was harming his brand or his goodwill. He did not bring this lawsuit for any reason contemplated by the Lanham Act.

He brought this lawsuit because he earns a living by suing others in the vaping industry for trademark infringement.

Sarieddine obtained a trademark registration without any use of the mark. He has now asserted that registration against 20 "infringers," extracting settlements and forcing them to change their names. In May 2018, Sarieddine sued Alien Visions for $10 million and demanded that it change the name it had used for nine years. It had no choice but to defend itself. And in the process of defending itself, it discovered that Sarieddine and his lawyers fabricated testimony and forged documents in their effort to substantiate this lawsuit. Moreover, he and his counsel have gamed the discovery process, mischaracterized cases, altered deposition testimony in bad faith, and exhibited a total lack of respect for the Court or the judicial process.

The Lanham Act, 15 U.S.C. § 1117(a), authorizes attorneys' fees to the prevailing party in an "exceptional case." As the Supreme Court and the Ninth Circuit have made clear, the standard is not especially onerous, requiring only that the case stand out from the ordinary. *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014); *Sunearth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179, 1181 (9th Cir. 2016). This case certainly meets the standard – particularly when considering the interest in deterring frivolous lawsuits. This case is also an example of one where sanctions on counsel are appropriate in light of the discovery abuses, frivolous arguments, and mischaracterizations perpetuated by Sarieddine's attorney.

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COST**

## II.     FACTUAL BACKGROUND

### A. Sarieddine's early sales

Sarieddine's business – at least in the United States – does not appear to be the sale of vaping products. In fact, there is *nothing in the record* showing a bona fide sale to a disinterested resale customer <u>ever</u> prior to his trademark application date in 2013. And after that, from 2008 until today, Sarieddine has not produced any evidence of advertising expenses that relate specifically to the U.S. *See* Summary Judgment Order ("Order") Dkt. 99 p.2; Dkt. 79-2, ¶12. From 2008 until 2015, he could not identify *any* distributors of his product or any websites (other than his own) where it was sold. Order p. 2; Dkt. 58-6, p. 7. And while he has provided a list of distributors and documents regarding his revenues from 2015-2018, most of those sales were to foreign customers. Dkt. 79-2, ¶ 14; Dkt. 79-4; Dkt. 58-6, pp. 38-40; and 79-3. In fact, of the $1 million in total income he reports during this timeframe, more than $900,000 came from customers abroad. Dkt. 79-2, ¶ 14. Indeed, from 2010-2015, *over a six-year period,* Sarieddine has provided evidence of only *21 orders* in the U.S. *See* Dkt. 79, pp. 29-30; Dkt. 79-5, ¶ 20. In 2015, he shipped three orders in the U.S., and in 2016 he shipped 44 orders in the U.S. Dkt. 79-5, ¶ 21.

Thus, by early 2017, Sarieddine had fewer than 100 sales of his product in this country, no U.S. advertising, and no goodwill or name recognition. He did, however, have two federal trademark registrations. In 2017, armed with his registrations and his lawyers, he began a crusade of lawsuits against companies in the industry using the term "alien." During one of these lawsuits he became aware of Alien Visions as a result of the filing of a declaration from Alien Visions' manager, Sam Ellinger, who stated that Alien Visions had been in business since mid-2010.[1] Dkt. 1, ¶34.

Knowing that he had no use of his mark until *maybe* 2014, but armed with lies and fake invoices (addressed *infra*), Sarieddine filed the present lawsuit in May 2018.

---

[1] Mr. Ellinger was overly conservative – Alien Visions began use in November 2009.

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COST**

He did this without undertaking any investigation *whatsoever* into Alien Visions – *not even a basic internet search* - prior to filing suit. Sarieddine 2019 Dep., p. 36 (Declaration of Amanda Hyland ¶ 49, Ex. M). Moreover, in his deposition, he could not identify *any* way in which he had suffered *any* damage caused by Alien Visions. *Id.* at 38-39. Yet, in this lawsuit he claimed "at least $10 million" in damages and a permanent injunction.  Dkt. 1, p. 21.

### B. Ever-Reversing, Contradictory First Use Dates

According to his original trademark application he filed *pro se* in May 2012 with the United States Patent and Trademark Office ("USPTO"), Sarieddine began selling vaporizers under the design mark "ALIEN VAPE. VAPE JUST GOT REAL!" at least as early as April 30, 2013. Three years later, Sarieddine hired a lawyer, Luke Brean, to file another application, and chose the same timeframe, April 15, 2013, as the first use date. These trademark applications matured into U.S. Reg. No. 4,517,249 on April 22, 2014, and U.S. Reg. No. 4,997,336 on July 12, 2016, respectively.

It was only after he became involved in trademark disputes in which he learned of others' use of the term "ALIEN" that predated May 2013 that he started claiming ever-reversing first use dates, each new date in response to an allegation of a third party's earlier date. In August 2016, Sarieddine was engaged in pre-suit settlement communications with Big Bang Vape Co. ("Big Bang"), which would later become the first of the 20 defendants to be sued. In those discussions, after being pointed to a March 2013 YouTube review of Big Bang's ALIEN PISS, he claimed a first use date of January 2013.[2] In those same discussions, after learning of Big Bang's November 2012 first-use date, he reversed his date again, this time to June of 2012. *Id.* He initiated the Big Bang lawsuit in February 2017 and claimed June 2012 as his first-use date in the initial complaint. Big Bang Dkt. 1, ¶ 6; (Judicial Notice ¶ 1, Ex.

---

[2] Request for Judicial Notice ("Judicial Notice") filed contemporaneously herewith, ¶ 2, Ex. B, with filings from *Sarieddine v. Big Bang*, Case No. 2:17-cv-989-DSF.

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COST**

A). Three months later, on May 26, 2017, in a declaration supporting his motion for preliminary injunction in the Smok case, he claimed that his first use was in May 2011. Case No. 2:17-cv-02390-DSF-SK ("Smok Case"), Dkt. No. 71-1 p.1 and 71-2 ¶ 1. (Judicial Notice ¶ 3, Exs. C and D). In response to the motion, in a filing on June 16, 2017, Smok's counsel presented evidence of Alien Visions' earlier use of the term "Alien" in the vaping industry. Smok Case Dkt. No. 102. (Judicial Notice ¶ 4, Exs. E-G). In response thereto, in a June 25, 2017, filing, Sarieddine *again* changed his first-use date, claiming that he had used the mark since 2008. Smok Case Dkt. No. 109-2 ¶ 4. (Judicial Notice ¶ 5, Ex. H).

In other words, after claiming *four* reversing use dates, he learned about the existence of Alien Visions and its 2009 launch, and then alleged a *fifth* first use date of 2008. The idea that he could "forget" about *five years* of use of his trademark in two different trademark applications defies plausibility. Once Sarieddine settled on 2008 as his "real" first use date, he relied upon the date to sue at least 20 defendants.[3]

## C. Forged Receipts

Sarieddine knows *nothing* about his claimed 2008 sales: He cannot recall which manufacturer made the vaping pens, and he has no record of communicating with the manufacturer, no record of ordering the pens, no record of paying for the pens, no memory of how many he ordered, no record of them being shipped to him, and no recollection of revenue they generated. Dkt. 58-6, pp. 10-14, 21. His only

---

[3] In filing order, all in this District: *Sarieddine v. Big Bang Vape Co. LLC.*, Case No. 2:17-cv-0989 (Fischer, J.) (Feb. 7, 2017); *Sarieddine v. D and A Distribution, LLC, et al.*, Case No. 2:17-cv-2390 (Fischer, J.) (March 28, 2017); *Sarieddine v. Sonder LLC*, No. 2:17-cv-3779) (Fischer, J.) (May 18, 2017); *Sarieddine v. Downtown Vapes LLC*, Case No. 2:18-cv-8342 (Anderson, J.) (Nov. 15, 2017); *Sarieddine v. Kenneth Andrews*, Case No. 2:18-cv-0077 (Fitzgerald, J.) (Jan. 4, 2018); *Sarieddine v. Alien Vapor Enterprises, LLC, et al.*, Case No. 2:18-cv-3297 (Snyder, J.) (April 19, 2018); *Sarieddine v. Alien Visions E-Juice, Inc.*, Case No. 2:18-cv-3658 (Anderson, J.) (May 1, 2018). Judicial Notice ¶ 7.

(Footnote continues on next page.)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COST**

evidence of the existence of any kind of activity in 2008 are three receipts for cash purchases purportedly issued to Harpreet Singh, Micah Davis, and Kourosh Mortazavi. For each alleged purchaser, Sarieddine produced a photocopy of a handwritten invoice signed by Sarieddine's friend, Rami Chemaly. Dkt. 58-6, pp. 19-20. The originals are gone, but incredibly, Mr. Chemaly had the foresight to photocopy them and hold onto those photocopies for a decade. *Id.* And also, quite conveniently, Mr. Chemaly vanished and cannot be deposed.[4]

The three invoices are all provably, unequivocally fake.

Importantly, vaping hardware in 2008 was in its infancy. Refillable "pens" that included a clear tank, called "clearomizers," were not available in the U.S. until the end of 2010, and the popular "CE4+" model was not available until 2011. This timeline has been explained by *three* vaping industry experts in their expert reports: Julia Woessner, National Policy Director for Consumer Advocates for Smoke-free Alternatives Association (¶¶16-17), Gregory Conley, President of the American Vaping Association (p. 2), and Oliver Kershaw, founder of e-cigareteforum.com and the E-Cigarette summit (pp. 6-7 and Ex. D).[5] Sarieddine has not provided *any* evidence that calls into question the timeline provided by these experts.

However, as shown below,[6] all of Sarieddine's witnesses testified that they bought a pen with a refillable tank in 2008, which is impossible because such a pen did not exist until 2010. Moreover, Sarieddine and Singh specifically identified the CE4+ pen as the model bought in 2008. That model was not available until 2011.

| Micah Davis | Harpreet Singh | Mike Sarieddine |
|---|---|---|
| **Q.** And tell me what the pen | **Q.** [W]hat did it look like?<br>**A.** It was a battery ***with a tank. . .*** | **Q.** And back in 2008, what exactly were |

---

[4] *See* Big Bang Case Dkt. 96 pp. 8-9 and 168-1 ¶ 4 for efforts to locate Chemaly, also known as Echemalian.

[5] These reports and accompanying declarations are attached hereto.

[6] Davis Dep. (Hyland Dec. ¶ 35, Ex.G, p. 11); Singh Dep. (Hyland Dec. ¶ 36, Ex. H, pp. 16-26-27); Sarieddine Dep. (Hyland Dec. ¶ 37, Ex. I, p. 61).

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COST**

| looked like and how -- like was it one piece or was it multiple pieces in a box? What did you actually buy?<br>**A. *It was a tank***, charger and the vape pen. | **Q.** Was it all one thing or were the items separate in a box?<br>**A.** It was a kit, yeah. It was in a box. ***And comes with a little clear tank***, battery and a charger . . .<br>**Q.** Do you see the product that's shown on this screenshot?<br>**A.** Yes.<br>**Q.** Is this what the product you bought from Rami Chemaly looked like? **. . .** did the components look like that?<br>**A.** Yes. | you selling under the Alien Vape mark?<br>**A.** It was a battery, ***tank*** and a charger.<br>**Q.** And what did -- what did the battery, tank and charger look like?<br>**A.** It's very familiar to the current product that I have in the picture that you showed me in Exhibit 4. |

In other words, Sarieddine and Singh testified that the image below on the right was the product they bought and sold in 2008. That image is of a CE4+ device. Its distinctive tank is shown more clearly on the left.[7]

| CE4+ refillable tank | Product purchased in 2008 (Exhibit 4 to Sarieddine deposition and Exhibit C to Singh deposition) |
|---|---|



Thus, all three people who testified about the 2008 sales, including Sarieddine himself, identified a device that did not exist until *years* later.

Sarieddine's third purported invoice is equally untenable. That invoice was written out to Kourosh Mortazavi – the only 2008 "purchaser" who was not friends with Rami Chemaly – and the only one who did not provide a declaration or become

---

[7] The tank is discussed and pictured in the expert report of Kershaw, attached hereto.

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COST**

represented by Sarieddine's attorneys. Mortazavi testified that he had no recollection of buying anything branded as "ALIEN VAPE," and most importantly, testified that he first met Chemaly at MC Vape Bar.  Hyland Dec. ¶ 38, Ex. J. MC Vape Bar, which was owned by Sarieddine, did not open until June 2013. Sarieddine Dep. 24-25 (Hyland Dec. ¶ 36, Ex. I). Thus, it is impossible that Chemaly sold Mortazavi *anything* in 2008, almost five years before they met.

The effects of using this fabricated evidence cannot be overstated.

The forged receipts are the only documents in the case that provide the foundation for Sarieddine's 2008 sales, and, ergo, this lawsuit. Indeed, Sarieddine has testified to this Court that these receipts to be the basis of his priority. *See* Sarieddine Dec. Dkt. 62-4 ¶ 4 and Ex. C thereto. In other words, without these forged receipts, this lawsuit probably would not have been filed. But that is not all. Alien Visions also had to set out to disprove them. In order to do that, it retained experts, took depositions, and engaged in discovery efforts.

It is also important to note that another defendant, Big Bang, has been pointing out the fraudulence of these invoices since the summer of 2018. *See, e.g.,* Big Bang Case, Dkt. 96 pp. 8-9 (Explaining in detail why "Big Bang is highly and reasonably suspicious of the purported 2008  . . . first-use dates"); Dkt. 112 (noting that "Sarieddine  . . .has fabricated evidence and made misrepresentations about that evidence."); Dkt. 113 (providing a lengthy explanation regarding "the purported 2008 sales – all of a vaping product that wasn't invented yet and wasn't introduced into the United States until 2010"). Moreover, Woessner's expert report served in the Big Bang case in June 2018 demonstrated that the purported 2008 vaping device did not exist until the end of 2010. Hyland Dec. ¶ 37. Sarieddine did not offer a rebuttal expert to Woessner in the Big Bang case or this case, and has expressed no interest in deposing her. *Id.* ¶ 38.

7

### D. Testimony regarding First-Use Date

When Sarieddine was deposed, he apparently realized that the 2013 first-use dates in two trademark applications, filed years apart, was problematic to his new claim of a 2008 first-use date. His solution was to lie, confound the actions of his trademark counsel, Luke Brean, and prompt a wild goose chase after Brean's files.

> **Q.** Is there anything that [your trademark attorney, Luke Brean,] put in this application that you didn't believe was correct? . . .
>
> **A.** The dates, first use in commerce, and the first use anywhere. I don't know where he came up with these. . . If he had asked me, that date would be different for sure. . . .
>
> **Q.** So it's your contention that your attorney made up that date?
>
> **A.** . . . my contention is that I did not give him that date. So he made it up.

Sarieddine Dep. pp. 146-48 (Hyland Dec. ¶ 36, Ex. I).

This testimony caused Big Bang, and later Alien Visions, to try to subpoena Brean for his files from Sarieddine, as these files had never been identified by Sarieddine as being in his possession.[8] Frustratingly, Brean did not want to be found and was skilled at utilizing a complex network of mailbox services and mail forwarding services. Hyland Dec. ¶ 42. A search by a team of private investigators failed for months to locate him, and it was only when the investigators started interviewing Brean's sister and mother that he called Alien Visions' counsel and agreed to accept service of a subpoena by email. *Id.* In response to that subpoena, Brean indicated that he had provide his entire file on Sarieddine to Sarieddine's lawyers in July 2018. *Id.* In other words, for *eight* months, and after receiving five notices of intent to serve nine subpoenas relating to Brean, Sarieddine's attorneys never disclosed that they

---

[8] The file would have been responsive to Big Bang's document requests, but these documents were not disclosed on a privilege log. Rather, Sarieddine's counsel indicated on numerous occasions that Sarieddine had not retained any emails from that time period. Hyland Dec. ¶ 41.

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COST**

were in possession of the file.

Once Brean disclosed that the file was in Sarieddine's possession, Alien Visions still had an uphill battle to obtain those files. After numerous hearings and motions with Magistrate Audero, Sarieddine reluctantly agreed to produce the files. Unsurprisingly, those files clearly show that Sarieddine completed an online form for Brean, the receipt for which shows "April 15, 2013" as the use date. *Id.* ¶ 43, Ex. K. In other words, Sarieddine identified the first-use date; Brean did not "make it up."

### E. Discovery and Litigation Conduct

Sarieddine and his counsel knew at the outset of this case that it lacked factual support, and they consciously avoided any investigation that would further undercut their case. Indeed, they failed to provide any experts, or to rebut or even depose Alien Visions' experts. Hyland Dec. ¶ 44. In fact, they took no depositions – not even of Alien Visons or Sam Ellinger. *Id.* ¶ 45.  They also served no discovery until the last moment, and too late to receive responses prior to summary judgment. *Id.* ¶ 46. Equipped with nothing but speculation, Sarieddine then moved for summary judgment, his attorney basing his arguments on what he would have dreamed the facts to be, without any discovery. *See* Dkt. 62-2 (Sarieddine's Statement of Facts, containing minimal citation to record). Alien Visions was then required to oppose a baseless motion.

In a similar vein, Sarieddine eventually abandoned his claim that he was owed damages stemming from a violation of California's unfair competition statute. Dkt. 78, 18-19. This claim was based on Sam Ellinger's declaration in the Smok case and supported by nothing more than the allegation that Ellinger, as the manager of Alien Visions, committed fraud by submitting the declaration based on his "personal" knowledge, as opposed to "institutional" knowledge. Dkt. 1 ¶¶ 67-72. Again, Sarieddine and his lawyers attempted no discovery *whatsoever* from Ellinger, or on

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COST**

this topic at all. Alien Visions was required to research and brief this meritless claim in its summary judgment motion. Dkt. 79, pp. 25-28.

While relying on a head-in-the-sand approach to taking discovery, Sarieddine's counsel at the same time employed a scheme in hopes he could *totally avoid* providing discovery to Alien Visions. Specifically, *after serving discovery himself* via email, receiving discovery via email, responding to document requests served by email with substantive objections, and receiving eight notices of 28 subpoenas via email, Sarieddine's counsel waited until the day of the response deadline to respond to interrogatories and admission requests, and then refused to answer them. Hyland Dec. ¶ 47; Dkt. 69. In a moment of "gotcha," he objected to every single request on the basis that the parties had not agreed to e-service. *Id.* This gamesmanship forced Alien Visions to request the first of many informal discovery conferences with Magistrate Audero to resolve the issue. *See id.* and Dkt. 69.

It is also worth noting that Sarieddine acquired trademarks from another of his 20 defendants *solely for the purpose of expanding his harassment of Alien Visions.* Indeed, using these new marks, he (unsuccessfully) attempted to add a new claim for trademark infringement to this matter at the close of discovery (Dkts. 50 and 56), and also filed another lawsuit against Alien Visions. Judicial Notice ¶ 6, Ex. I.

**F. Sarieddine and his counsel committed fraud on the Court.**

Sarieddine's counsel continued to engage in unethical tactics in his summary judgment briefing. First, in his summary judgment motion, Sarieddine's counsel misrepresented the holdings of *seven* cases in an attempt to argue that Sarieddine's incorrect first use date is immaterial. *See* Dkt. 77, pp. 15-18. One week later, in his opposition to Alien Visions' summary judgment motion, Sarieddine and his counsel submitted a document Sarieddine swore was the specimen from his trademark application, but the exhibit included an extra image, not included with the original application specimen, in a fraudulent attempt to show that Sarieddine had used his

10

logo on products on his filing date. Dkt. 78-2 ¶ 4; *see also* Dkt. 89-1, p. 16. The Court cited that declaration in denying Alien Visions' motion for summary judgment. Order (Dkt. 99) p. 11 (citing Dkt. 78-2 ¶ 4 and denying summary judgment "with respect to Plaintiff's alleged lack of use of his mark or his allegedly fraudulent statement about his date of first use . . . Plaintiff has submitted a declaration stating that his marks were in use as of the time he filed his first trademark application.").

Sarieddine's counsel also relied upon sham testimony in opposition to Alien Visions' motion. Sarieddine had testified unequivocally that he created the ALIVE VAPE logo in 2013 in China, and that the logo was first used on products that he did not receive or sell until months later. *See* Dkt. 79 p. 9:5-12. In his opposition brief, Sarieddine's counsel improperly relied on an errata sheet that transparently attempted to substantively "fix" that testimony.  *See* Dkt. 98-1, pp. 5-13.

### III.   LEGAL STANDARD AND ARGUMENT

The Lanham Act provides reasonable attorneys' fees to the prevailing party in exceptional cases. 15 U.S.C. § 1117(a). In 2014, the Supreme Court held that "an 'exceptional' case is simply one that stands out from others." *Octane Fitness,* 572 U.S. at 553. A case may "stand[] out from others" either "with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Id*. Further, in assessing whether to award fees, courts are to consider a party's "motivation" in pursuing litigation, and "the need in particular circumstances to advance considerations of compensation and deterrence." *Id*. at 554 n.6  (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534, n.19 (1994)) (internal quotation marks omitted). The Ninth Circuit recently made clear that the *Octane Fitness* standard for attorneys' fees requests applies in Lanham Act cases. *Sunearth,* 839 F.3d at 1181. An exceptional case need only be shown by a preponderance of the evidence, and the determination is left to the court's discretion. *Octane Fitness*, 572 U.S. at 557-58.

11

### A. Sarieddine's claims were substantively meritless

Sarieddine had no trademark rights to enforce against Alien Visions from the start. In fact, when he filed this lawsuit, the *only* thing Sarieddine knew about Alien Visions was that it had used the mark since 2010 – *years* before Sarieddine had a handful of sales in 2014.

A case can transform from an ordinary one into an exceptional one when a party fails to develop or offer any evidence on a central element of its case. *Dzinesquare, Inc. v. Armano Luxury Alloys, Inc.*, 2015 U.S. Dist. LEXIS 178443 (C.D. Cal. April 1, 2015), is illustrative. There, the court granted summary judgment for the defendant on plaintiff's trade dress claims, finding the plaintiff had failed to offer any evidence that it had protectable trade dress rights. It then awarded fees:

> [Plaintiff's] dearth of evidence to at least create a genuine dispute regarding its claim indicates a very weak litigation position. Based on the profound weakness of [its] litigating position for both trade dress claims, they "stand out from others" and are exceptional under the *Octane Fitness* definition.

*Id.* at *11. It likewise granted fees for the defense of a patent claim that it rejected on summary judgment. *Id.* at *7, 9-12 ("such a weak litigating position is alone sufficient to conclude that [plaintiff's] patent infringement claim 'stands out from others' and is an exceptional case meriting attorneys' fees"); *see also SECALT SA v. Wuxi Shenxi Const. Mach. Co.*, 668 F. 3d 677, 688 (9th Cir. 2012) (finding case exceptional under stricter pre-*Octane Fitness* standard because of plaintiff's "utter failure of proof" on a key issue); *AAT Bioquest, Inc. v. Tex. Fluorescence Labs., Inc.*, 2015 U.S. Dist. LEXIS 160369, at *48 (N.D. Cal. Nov. 30, 2015) (finding case exceptional because defendant's "unsupported belief in the strength of its arguments was unreasonable in light of its failure to present evidence supporting its positions").

Here, Alien Visions' priority was never subject to a reasonable dispute. Sarieddine filed this case knowing that Alien Visions' priority went back *at least* to

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COST**

2010. He then failed to undertake any further investigation into the issue prior to filing suit, and during litigation he developed no legitimate evidence to support his claim of priority. During summary judgment, he rested his case on the incorrect statement of law that Alien Visions was required to establish market penetration, deliberately ignoring the correct "totality of the circumstances" test. – a test that *he wrote about* on his blog in 2017. *See* Order (Dkt. 99) pp. 7-8 and Hyland Dec. ¶ 48 and Ex. L. Put differently, Sarieddine utterly failed to establish the fundamental foundation for his entire case. *See Cambrian Sci. Corp. v. Cox Commc'ns, Inc*., 79 F. Supp. 3d 1111, 1114, 1116 (C.D. Cal. 2015) ("A case presenting either subjective bad faith or exceptionally meritless claims may sufficiently set itself apart from mine-run cases to warrant a fee award" and granting fees for defense of those of plaintiff's patent claims that were "exceptionally lacking in substantive strength").

### B. Fraud on the Court Renders this Case Exceptional and Warrants Sanctions.

As set forth fully *supra,* Alien Visions has proven by a preponderance of the evidence that Sarieddine's only basis for claiming priority was a set of forged receipts. And, to the extent Sarieddine's counsel may have been unaware of this fraud initially, they certainly were put on notice by the Woessner report in June 2018. Nonetheless, Sarieddine and his attorney persisted, both in the Big Bang case and here. And they continued to do so even after Alien Visions provided two *additional* experts who also testified that the device Sarieddine purportedly sold in 2008 didn't exist until 2011. At no point did his attorney try to depose the experts, or offer a rebuttal expert, or retract the forgeries. Rather, they submitted false evidence to the Court and forced Alien Visions to prepare for trial on this issue. Dkt. 62-4 ¶ 4.

Use of forged documents to assert priority certainly makes this case "stand out from others" as an exceptional case. *Octane Fitness*, 134 S. Ct. at 1756. Moreover, the extraordinary bad faith and fraud demonstrated in this matter justifies sanctions

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COST**

against Sarieddine and his counsel. When a fraud is committed upon the Court, the Court may rely upon Rule 11 and its inherent power to sanction. *Chambers v. Nasco*, 501 U.S. 32, 45 (1991). The inherent power is properly utilized to preserve the dignity of the court and the integrity of the judicial process. *Id*. A party demonstrates bad faith by "knowingly or recklessly rais[ing] a frivolous argument, or argu[ing] a meritorious claim for the purpose of harassing an opponent. . . . [or] by delaying or disrupting the litigation . . ." *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 649 (9th Cir. 1997) (internal citation omitted). "For purposes of imposing sanctions under the inherent power of the court, a finding of bad faith does not require that the legal and factual basis for the action prove totally frivolous." *Fink v. Gomez*, 239 F.3d 989, 991-92 (9th Cir. 2001). All that is required is for a litigant to be "substantially motivated by vindictiveness, obduracy, or mala fides." *Id.* Any party presenting a declaration in bad faith may be guilty of contempt and ordered to pay the opposing party's attorney fees and expenses. *See* Fed. R. Civ. P. 56(h).

The reliance upon three forged invoices constitutes a fraud upon the Court. To the extent Sarieddine's counsel claims lack of knowledge of this fraud, such a claim could only be characterized as willful ignorance in light of the voluminous evidence that was presented, and unrebutted, regarding the forged invoices.[9]

Moreover, as fully described *supra*, counsel's filings further warrant sanctions. *See Fink,* 239 F.3d at 994 ("[A]n attorney's reckless misstatements of law and fact, when coupled with an improper purpose... are sanctionable under a court's inherent power."). Sarieddine's counsel provided this Court with a materially altered exhibit that purported to be the original trademark specimen. Such a filing constitutes bad

---

[9] Compare current counsel's actions to those taken by prior counsel -- soon after Big Bang identified problems with the integrity of the 2008 receipts, Mr. Sarieddine's first lawyer filed a "noisy withdrawal" in the Big Bang case and then withdrew from this case as well. *See* Big Bang Dkt. 136.

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COST**

faith. In another attempt to mislead the Court, he cited *seven* cases in Sarieddine's summary judgment motion for the proposition that an incorrect first use date in an application cannot be the basis for canceling a trademark. Every one of the seven cited cases was misstatement of law "coupled with an improper purpose."

Finally, Sarieddine and his counsel's use of an improper errata sheet in an effort to defeat summary judgment is sufficient, on its own, to warrant sanctions against both. *Combs v. Rockwell Int'l Corp.*, 927 F.2d 486, 488-89 (9th Cir. 1991) (dismissing with prejudice and granting Rule 11 sanctions against a party and its counsel because the attorney, in an effort to avoid summary judgment, made substantive changes to the party's deposition testimony in violation of Fed R. Civ. P. 30(e)); *Haeger v. Goodyear Tire & Rubber Co.*, 793 F.3d 1122, 1133 (9th Cir. 2015) ("Actions constituting a fraud upon the court or actions that cause the very temple of justice [to be] defiled are . . . sufficient to support a bad faith finding."); *see also Love v. Associated Newspapers, Ltd.*, 611 F.3d 601 (9th Cir. 2010) (affirming the district court's sanction of a lawyer who provided a misleading third-party affidavit in an effort to substantiate his client's claims, which "lengthened or multiplied" the work of the defendants.).

Parties cannot choose when to tell the Court the truth. They must be truthful with the Court at all stages of the proceedings if judicial review is to have any real meaning. The Court should refuse to countenance these repeated and flagrant abuses.

**C. The conduct in this case renders it exceptional and warrants sanctions.**

"A case may be exceptional based on the unreasonable manner in which it was litigated." *Digital Reg of Tex., LLC v. Adobe Sys.*, 2015 U.S. Dist. LEXIS 29328, *9 (N.D. Cal. March 9, 2015) (citation omitted). And courts have increasingly cited litigation misconduct to support fee awards following *Octane Fitness. See, e.g.*, *Digital Reg.*, 2015 U.S. Dist. LEXIS 29328 at *9-14 (citing party's failure to produce material documents and neglecting to inform opposing counsel of a change in a

15

witness' testimony to support exceptional case determination); *Cambrian Sci. Corp.*, 79 F. Supp. 3d at 1120  (citing party's unnecessary generation of discovery burdens and behavior in noticing a deposition to support exceptional case determination); *Universal Elecs., Inc. v. Universal Remote Control, Inc.*, 2015 U.S. Dist. LEXIS 91403, at \*15-16 (C.D. Cal. Mar. 10, 2015) (citing plaintiff's provision of evasive responses to interrogatories and failure to supplement in a timely or straightforward manner to support exceptional case determination).

Section 1927 authorizes sanctions against attorneys "who wrongfully proliferate litigation proceedings once a case has commenced." *Pacific Harbor v. Carnival Air Lines, Inc.*, 210 F.3d 1112, 1117-18 (9th Cir. 2000). Before they can be imposed, Section 1927 sanctions "must be supported by a finding of subjective bad faith." *Id*. at 436 (quoting *New Alaska Dev. Corp. v. Guetschow*, 869 F.2d 1298, 1306 (9th Cir. 1989)). Subjective "[b]ad faith is present when an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent." *Id*. (quoting *Estate of Blas v. Winkler*, 792 F.2d 858, 860 (9th Cir. 1986)). "Tactics undertaken with the intent to increase expenses, or delay, may also support a finding of bad faith." *New Alaska*, 869 F.2d at 1306 (internal citations omitted). Indeed, "[e]ven if an attorney's arguments are meritorious, his conduct may be sanctionable if in bad faith." *Id*. (citation omitted).

A case that relies on forged invoices is obviously one that has been litigated in an "unreasonable manner" and has included "[t]actics undertaken with the intent to increase expenses."  Sarieddine and his counsel knew from the start of this litigation that the claims had no chance of success because he had no real sales and no evidence to support his claimed priority. Worse, the unfair competition claim premised on Sam Ellinger's declaration was so meritless that they walked away from it without even trying to find facts or law to back it up.

16

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COST**

Moreover, they were willfully blind to the discovery of facts that would further undercut their meritless complaint, wholly ignoring Alien Visions' experts, taking no depositions, and taking no written discovery prior to summary judgment, all while obstructing Alien Visions' efforts to take discovery. And the only motions they filed in this case were unwarranted – one motion asserting newly purchased trademarks and seeking to add new claims at the close of discovery, and a summary judgment motion based on make-believe facts.  In sum, Sarieddine and his attorney pursued this meritless case in a manner that was unreasonable and that caused Alien Visions great stress and unnecessary expense. Sanctions under 28 U.S.C. § 1927 and the Court's inherent authority are therefore warranted.

**D. This Court should follow the *Brett* decision**

The facts of this case, in many ways, resemble those in *Central Manufacturing, Inc. v. Brett*, 492 F.3d 876 (7th Cir. 2007). In *Brett,* the Seventh Circuit dealt harshly with a plaintiff commentators have described as a trademark "troll,"[10] upholding a district court's decision canceling his registration and awarding attorneys' fees and costs. In upholding the award of fees and costs, the Seventh Circuit stated that the standard was essentially whether the litigation was "oppressive." The Court, noting that trademark litigation was "the essential part of [plaintiff's] business strategy," said that "were there a Hall of Fame for hyperactive trademark litigations, [plaintiff] would be in it." *Id.* at 880. As in this case, the plaintiff in *Brett* relied upon a federal registration, but ultimately could provide no reliable evidence of use in commerce to create priority over the defendant. *Id.* at 882. As explained by the Seventh Circuit:

[Plaintiff] filed an infringement lawsuit without evidence of any sales of baseballs or baseball bats to support its claim to rights in the "Stealth" mark

---

[10] *See* Rebecca Tushnet, *Registering Disagreement: Registration in Modern American Trademark Law*, 130 Harv. L. Rev. 867, 917 (2017) Michael S. Mireles, *Trademark Trolls: A Problem in the United States*, 18 Chap. L. Rev. 815, 866 (2015).

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COST**

for such products. It ignored requests to produce documents to support its claim, forcing the defendants' lawyers to go to court to compel action. Stoller offered confused, misleading deposition testimony with unfulfilled promises of cooperation. And the documents eventually produced effectively made a mockery of the entire proceeding.

*Id.* Also instructive is *S.C. Johnson & Son, Inc. v. Nutraceutical Corp.*, 2019 U.S. Dist. LEXIS 47937, at *42, 39 (E.D. Wis. Mar. 22, 2019). In *Neutraceutical,* the Court awarded attorney's fees to the defendant who was forced to counter plaintiff's incorrect legal theories. Notably, just as Sarieddine did in this case, the plaintiff "maintained an argument for the market penetration test despite knowing of binding precedent mandating a totality-of-the-circumstances analysis." *Id.* at 35.

In these cases, the courts both took seriously the underlying bad faith motivation in bringing suit, discovery abuses, abuse of the judicial process, and deliberate mischaracterization of law. This Court should do the same. Indeed, the instant case, in many ways, presents more egregious facts than either illustrative case, begging the question: if this is not an "exceptional case" and one demonstrating sufficient bad faith to assess sanctions, then what sort of case would qualify?

### IV. THE FEES AND COSTS ARE REASONABLE.

The starting point in assessing the reasonableness of fees is an assessment of the number of hours expended on the litigation multiplied by a reasonable hourly rate. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). There is a strong presumption that the fees calculated in this manner are reasonable. *See City of Burlington v. Dague*, 505 U.S. 557, 562 (1992).

### A. There Should Be No Apportionment for Non-Lanham Act Claims.

There should be no apportionment of fees for defending non-Lanham Act claims in this case for two reasons. First, Alien Visions has established its entitlement to attorneys' fees based on 28 U.S.C. § 1927 and the inherent power of this Court, as

18

well as under the Lanham Act, which supports an award of fees beyond those directly related to Lanham Act claims. Second, Sarieddine's claims for California common law infringement and California unfair competition both focus on the same basic conduct (*viz.*, allegations that Alien Visions' use of its mark constituted trademark infringement, false designation of origin, and false description likely to cause confusion or to deceive), and therefore no differentiation between Lanham and non-Lanham Act claims is necessary. *See, e.g., Blizzard Entm't, Inc. v. Blizzard Sports Ctr., Inc.,* Case No. SACV 17-1001 JVS(DFMx) at *12 (C.D. Cal., Nov. 2, 2018).

## B. Alien Visions' Fees are Appropriate under the Lodestar Analysis.

Sarieddine's unfounded claims in this case directly threatened Alien Visions' right to use its name. It is not an exaggeration to say that Sarieddine knew this lawsuit could put Alien Visions out of business, and he used this bet-the-company risk as leverage. For its successful and complete defense of those claims and the cancellation of Sarieddine's marks, over a hard-fought 13 months of litigation, Alien Visions now seeks reimbursement of $637,930.50 in attorneys' fees and $107,388.17 in nontaxable costs for expert witness fees, discovery vendor costs, and travel. Those amounts are manifestly reasonable.

As detailed in the declaration of its lead counsel, Amanda Hyland, as well as in the declarations of One LLP attorneys William O'Brien and John Lord, Alien Visions seeks reimbursement for fees incurred by Taylor English Duma LLP ("TED") and One LLP attorneys and other timekeepers. All partners were billed at $350, associates between $315 and $330, and non-attorneys no-charged, or at most, billed at $125 for work billed through April 2018.[11]

---

[11] As counsel has performed and will be performing additional work on work on this case in connection with this motion, Alien Visions will be submitting a supplement outlining the additional fees and costs incurred. "[T]ime spent by counsel in establishing the right to a fee award is compensable." *Davis v. City of S.F.*, 976 F.2d 1536, 1544 (9th Cir. 1992).

19

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COST

Discovery and motion practice in the case were particularly arduous and expensive, as outlined in detail in the section of this Motion on the "exceptional nature" of this lawsuit. To summarize, in order to build the factual record to refute Sarieddine's claims, Alien Visions served 28 third-party subpoenas, collected, reviewed, and produced more than 200,000 pages of documents, prepared for three depositions, and expended great efforts to locate Luke Brean. Hyland Dec. ¶ 34. Costs were, fortunately, reduced due to the discovery-sharing agreement that allowed the parties to rely on the discovery obtained in the Big Bang case, which certainly saved hundreds of thousands of dollars in fees. *Id.* As described above, Alien Visions was forced to file a motion to compel to obtain Mr. Brean's files and to fight over Sarieddine's counsel's last-minute claim that exchange of discovery by e-mail was improper. *Id.* The case also required opposing Sarieddine's late-filed motion to amend the complaint and modify the scheduling order to extend discovery (which motion the Court denied); proving forgeries of invoices and falsification of documents; overcoming false and substantive changes to Sarieddine's deposition testimony on his errata sheet; attending multiple telephonic hearings with Magistrate Audero; preparing an opposition brief to Sarieddine's meritless summary judgment motion, preparing a comprehensive summary judgment motion and brief on numerous grounds, with supporting documents and declarations; preparing for and attending an unsuccessful mediation; and, as alluded to above, arranging for the creation of expert reports from four expert witnesses. *Id.*

Ms. Hyland and senior associate Seth Trimble handled the lion's share of the work in the case. Ms. Hyland and Mr. Trimble developed the strategy for the case, handled the discovery process, managed Alien Visions' experts, prepared for depositions, were the primary authors of almost all motions, briefs, declarations, and related documents, participated in all court conferences, and prepared for and (in Ms. Hyland's case) attended the failed mediation. Other qualified TED attorneys provided

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COST**

assistance as outlined in Ms. Hyland's declaration and in the fee invoices attached thereto. *See id*. ¶¶ 6-22, Ex. B. Local One LLP attorneys John Lord and Oscar Orozco-Botello, both skilled trademark litigators, provided counsel as to local rules and customs, assisted in the preparation of briefs, and handled all filings. Declaration of John Lord ¶¶ 6-10. The attorneys' qualifications are summarized in the Lord (¶¶ 5, 13), Hyland (¶¶ 7-22), and O'Brien Declarations (¶¶ 13-18).

Over the course of the case and in connection with this request, Ms. Hyland reviewed time records for the work performed and determined that none of the charges were unnecessary or excessive in light of the hotly-contested and fast-paced nature of the case. Hyland Dec. ¶ 24. Moreover, any unnecessary or duplicative hours were removed from the invoices prior to submission to the client, including numerous hours deleted to compensate for the inefficiencies of a first-year attorney. *Id.*

In addition, "the district court must determine a reasonable hourly rate considering the experience, skill, and reputation of the attorney requesting fees." *Chalmers v. City of L.A.,* 796 F.2d 1205, 1210 (9th Cir. 1986). This determination "is not made by reference to rates actually charged [by] the prevailing party." *Id*. The fee applicant bears the burden of showing that "the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 980 (9th Cir. 2008) (citation omitted). "Affidavits of the [party's] attorney and other attorneys regarding prevailing fees in the community, and rate determinations in other cases, particularly those setting a rate for the [party's] attorney, are satisfactory evidence of the prevailing market rate." *United Steelworkers of Am. v. Phelps Dodge Corp.,* 896 F.2d 403, 407 (9th Cir. 1990). Courts may also "rely on [their] own familiarity with the legal market." *Ingram v. Oroudjian*, 647 F.3d 925, 928 (9th Cir. 2011). As a general rule, the forum district represents the relevant legal community. *See Gates v. Deukmejian*, 987 F.2d 1392, 1405 (9th Cir. 1992).

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COST**

Here, the hourly rates are more than reasonable for intellectual property litigation in this district. In almost every instance, the rates reflect a discount from those each firm typically charges. Hyland Dec. ¶ 25; O'Brien Dec. ¶ 22; Lord Dec. ¶ 12. Except for Scot Burton, an experienced tax partner who billed out at $395, all partner-level attorneys billed Alien Visions at $350 or $315. According to publicly-available market data, these rates are well below the range charged by similar firms in the area for similar matters. For example, the 2018 Real Rate Report ("RRR") shows that the surveyed firms and practitioners in the Los Angeles area indicated that attorneys who practiced intellectual property law in the third quarter of 2018 charged rates as follows:

| Level | First Quartile | Median | Third Quartile | Mean |
|---|---|---|---|---|
| Partner | $437 | $759 | $919 | $714 |
| Associate | $407 | $675 | $790 | $628 |

Lord Dec. ¶ 17 & Ex. D at 103. The rates are well below the mean. Other judges of this Court have recognized the RRR as providing instructive data on rates in a given market. For example, in *Luna v. Universal City Studios, LLC*, 2016 U.S. Dist. LEXIS 194527 (C.D. Cal. Sept. 13, 2016), the Court noted:

> The Court turns to the Real Rate Report as a useful guidepost to assess the reasonableness of these hourly rates in the Central District. *See Eksouzian v. Albanese*, 2015 U.S. Dist. LEXIS 189545, *4-5 (C.D. Cal. Oct. 23, 2015); *Carbajal v. Wells Fargo Bank, N.A.*, 2015 U.S. Dist. LEXIS 192555, *5 (C.D. Cal. July 09, 2015). As Judge Fisher explained in *Hicks v. Toys 'R' Us-Delaware, Inc.*, the Real Rate Report is persuasive because it:
>
> > identifies attorney rates by location, experience, firm size, areas of expertise, and industry, as well as the specific practice areas, . . . [and] it is based on actual legal billing, matter information, and paid and processed invoices from more than 80 companies—a much better reflection of true market rates than self-reported rates in all practice

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COST**

areas as part of a national survey of top firms. 2014 U.S. Dist. LEXIS 135596, at *1 (C.D. Cal. Sept. 2, 2014).

Courts in California have awarded fees at markedly higher rates in recent comparable cases. For example, in *Entrepreneur Media, Inc. v. Casey et al.,* No. CV 18-1058 JLS, Dkt. 24 (C.D. Cal. Feb. 22, 2019), the Court concluded that, based on the 2016 RRR, hourly rates of $600 and $275 were reasonable for a Latham & Watkins associate and paralegal in a trademark case. And, in *AECOM Energy & Constr., Inc. v. Ripley*, 2018 U.S. Dist. LEXIS 27035 (C.D. Cal. Feb. 16, 2018), the Court found a partner rate of $892, associate rate of $554, and paralegal rate of $334 to be in line with rates courts in the Central District have previously approved and thus "reasonable and consistent with comparable market rates." *See also Perfect 10, Inc. v. Giganews, Inc.,* 2015 U.S. Dist. LEXIS 54063, at *45 (C.D. Cal. Mar. 24, 2015) (finding partner rates between $610 to $930 and associate rates between $350 to $690 to be reasonable in copyright infringement case); *Burton Way Hotels, Ltd. v. Four Seasons Hotels Ltd.*, 2015 WL 13081297, at *3 (C.D. Cal. Jan. 21, 2015)(approving partner rate of $886.50 and associate rate of $540); *Banas v. Volcano Corp.*, 47 F. Supp. 3d 957, 965 (N.D. Cal. 2014) (approving hourly rates ranging from $355 to $1,095 per hour for partners and associates and $245 to $290 per hour for paralegals); *In re High-Tech Emple. Antitrust Litig.*, 2015 U.S. Dist. LEXIS 118052, at *33-34 (N.D. Cal. Sep. 2, 2015) (approving hourly rates ranging from $490 to $975 for partners, $310 to $800 for associates, and $190 to $430 for paralegals).

### C. No Adjustment of the Lodestar Amount is Warranted.

Ms. Hyland and Mr. Trimble were precluded from taking on other matters due to the acceptance of this case, cases on which they undoubtedly would have charged higher rates. The nature of the case and the opponent (and his counsel) required Alien Visions' attorneys to litigate the case aggressively and fight numerous issues triggered by Sarieddine's positions or conduct. No downward adjustment to the

23

lodestar amount is therefore justified. Moreover, even though an ***upward*** adjustment in the amount may be justified because of these factors, Alien Visions is not requesting such an increase.

## V.     NON-TAXABLE COSTS SHOULD BE AWARDED.

"[A]ttorney's fees under the Lanham Act may also include reasonable costs that the party cannot recover as the 'prevailing party.'" *SECALT SA,* 668 F. 3d at 690. Recoverable costs need only be "reasonably incurred." *Id.* (awarding costs for "legal research," "deposition expenses," and "expert witness fees"). Here, Alien Visions seeks to recover non-taxable costs that it paid: (1) to discovery vendors,[12] (2) to expert witnesses,[13] (3) for depositions and hearings, including travel,[14] and (4) private investigator fees.[15] All of these costs were necessarily and reasonably incurred and are substantiated in the accompanying declaration of Alien Visions' counsel.

| | |
|---|---|
| Discovery Vendor Fees | $44,308.32 |
| Expert Witness Fees | $27,357.50 |
| Deposition/Hearing Costs | $16,353.52 |
| Private Investigator Fees | $19,368.83 |
| **Total Non-Taxable Costs** | $107,388.17 |

[12] The three vendors are: (1) Ricoh USA, which provided document hosting services, (2) Hanzo Archives Ltd., a company that captured tens of thousands of web pages from ECF, NuVapor, and YouTube, and (3) Digistream, which located and collected information from social media sites on various witnesses. Hyland Dec. ¶ 26, Ex. C.

[13] As noted above, Alien Visions enlisted four experts to give reports in this matter: Oliver Kershaw, Julia Woessner, Gregory Conley, and Denise Dauphin, each of whom prepared a detailed expert report. Mr. Kershaw billed $2,400 for his work. Ms. Dauphin billed $24,957.50 for her work. Hyland Dec. Exs. D & E. As further testament to the reasonableness of the costs, two of the experts, Ms. Woessner and Mr. Conley, did not charge Alien Visions for their time. Hyland Dec. ¶¶ 27-31.

[14] Because Sarieddine is located in California and filed suit there, Ms. Hyland was required to make multiple trips there for mediation and depositions. Alien Visions seeks to recover the travel costs for those trips, along with the cost of videotaping the depositions which is not otherwise recoverable. Hyland Dec. ¶ 32.

[15] As detailed *supra,* Alien Visions retained private investigators to locate Sarieddine's trademark attorney Luke Brean. Hyland Dec. ¶ 33 and Ex. E.

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COST**

## VI.   CONCLUSION

Sarieddine's complaint was baseless and based on fraudulent invoices, and he and his counsel knew it. However, their strategy was not to win, but to scare and exhaust Alien Visions into submission, just as he has done in his relentless pursuit of 20 other defendants over the last two years. The failure to pursue discovery, efforts to obstruct Alien Visions' attempts to obtain discovery, and procurement of trademarks to add to this case (and form the basis for another), all underscore the bad faith and improper motives exhibited by Sarieddine and his counsel. This opportunistic abuse of the judicial process should not be tolerated. This Court is the first to resolve any of Sarieddine's cases on the merits. It should make use of this opportunity to deter such conduct and compensate Alien Visions.

## VII.   EVIDENTIARY HEARING

This motion is ripe for resolution on the briefs. Alien Visions recognizes, however, that this Motion presents new factual issues, and that the Court may find an evidentiary hearing helpful. If the Court wishes to schedule an evidentiary hearing, Alien Visions would need to subpoena several witness and hopefully arrange for the attendance of its industry expert Oliver Kershaw, a resident of Australia. Therefore, Alien Visions requests that any evidentiary hearing be specially set with at least two weeks' notice. To the extent the Court would like to schedule a hearing but has a full calendar, Alien Visions consents to resolution of this motion by a magistrate.

Dated: May 8, 2019                **ONE LLP**

By: /s/John E. Lord
    John E. Lord

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COST**

1

**TAYLOR ENGLISH DUMA LLP**

2

By:  /s/ Amanda G. Hyland

3

Amanda G. Hyland (admitted *pro hac vice*)

Seth K. Trimble (admitted *pro hac vice*)

4

5

*Attorneys for Defendant*

*Alien Visions E-Juice, Inc.*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COST**